## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KATELYN WILLS, | * | |
| *Plaintiff,* | * | |
| v. | * | Civil Action No. RDB-23-1158 |
| MPF FEDERAL, LLC, | * | |
| *Defendant.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

In this employment suit, Plaintiff Katelyn Wills ("Plaintiff" or "Wills") alleges that her former employer, MPF Federal, LLC ("Defendant" or "MPF"), terminated her position in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't §§ 20-601 *et seq. See generally* (ECF No. 5). From December 2020 to June 10, 2022, Wills was a project manager for MPF's contract work for the United States Army Medical Research Institute of Chemical Defense (the "Government") at the Government's Aberdeen Proving Ground facility in Maryland. MPF terminated Wills on June 10, 2022, after the Government expressly requested that it do so, citing concerns with Wills's performance and the fact that she was not a Certified Manager of Animal Resources ("CMAR"). MPF's contract with the Government required that the project manager be so certified. At the time of her termination, Wills had not obtained certification, despite having been eligible to become so since January 17, 2022, and the repeated requests of her employer, MPF, and its client, the Research

1

Institute. Due to both her work performance issues and her lack of certification as a CMAR, MPF terminated Wills's employment on June 10, 2022.

In her two-Count Amended Complaint, Wills essentially alleges that MPF's stated reasons for terminating her employment were mere pretext for sex and pregnancy discrimination. *See generally* (ECF No. 5). She argues that she was terminated not due to a lack of certification or any performance concerns, but because she informed MPF of her pregnancy on May 11, 2022. (*Id.*) Presently before the Court is MPF's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (ECF No. 37). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. The Court has reviewed the parties' submissions; no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons set forth below, MPF's Motion for Summary Judgment (ECF No. 37) is GRANTED.

## BACKGROUND

"[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### I.     Factual History

From 2017 to June 10, 2022, Plaintiff Katelyn Wills was employed by a series of three private contractors working pursuant to contracts with the United States Army Medical Research Institute of Chemical Defense (the "Government" or the "Research Institute. (ECF No. 5 ¶ 14; ECF No. 37-4 at 7–8.) For context, the Government describes the Research Institute of Chemical Defense as "the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development." (ECF No. 37-3 at

7.) The Research Institute is based in its laboratories at Aberdeen Proving Ground in Maryland. (*Id.*) Its stated mission is "to discover and develop medical products and knowledge solutions against chemical threats through research, education and training, and consultation." (*Id.*) Of the three private contractors for whom she worked, Wills began with SoBran, Inc., as a veterinary technician I, a position that required her to care for the laboratory animals that the Government used in its medical research.[1] (ECF No. 37-4 at 7–9.) Some time later, though unclear in the record, the Government awarded the work that SoBran had been doing to Venesco, LLC. (*Id.* at 9–10.) Wills consequently began working for Venesco, first as a veterinary technician II. (*Id.* at 10.) She was then promoted to the position of veterinary technician III. (*Id.* at 11.) She was promoted again in April 2020 to the position of project manager after her predecessor in that position was terminated by Venesco. (*Id.* at 11–12.)

Wills's final role at Venesco, project manager, came with professional certification requirements established by the Government. Specifically, a project manager on such work for the Research Institute needed to be a Certified Manager of Animal Resources ("CMAR"). (*Id.* at 15–16.) Importantly, a person is not eligible to sit for the exams until they have accumulated five years of laboratory research, including three years of supervisory experience. (*Id.* at 18.) Once eligible, an applicant must sit for multiple examinations. Collectively, these tests have a twenty percent pass rate. (*Id.* at 26.) Wills was not a CMAR when she was promoted to the project manager role by Venesco. (*Id.* at 18.) In fact, she was not eligible to sit for the examinations at that point, as she had not yet accrued sufficient laboratory and

---

[1] The Court notes that, from numerous references in the record, Wills's positions with the various private contractors, including MPF, apparently required her to deal with mice and rats. It is unclear if other animals were involved.

3

supervisory experience. (*Id.*) She served in that position for Venesco for roughly eight months. (*Id.* at 11–13.)

On December 1, 2020, the Government awarded the work Venesco had been doing to Defendant MPF. (ECF No. 37-3 at 2, 5, 7.) The Government and MPF entered into a contract for the work to be performed, which included a performance work statement. The contract specifically provided that, within six months of the contract award, the project manager on MPF's work for the Government would be a Certified Manager of Animal Resources. (ECF No. 37-3 at 17.) The contract also provided that the Government had reserved to itself "the right to require [MPF] to remove and replace any personnel who provide unsatisfactory service, demonstrate insufficient knowledge, or possess inadequate skill levels." (*Id.* at 10.) Finally, the contract provided that "[f]ailure to provide the support services needed to carry out and complete routine requirements would be extremely detrimental to the mission." (*Id.* at 7.)

At the time that the Government awarded MPF the work that Venesco had been doing, Wills was still working as a project manager and still was ineligible to sit for the Certified Manager of Animal Resource examinations. (ECF No. 37-4 at 19–21, 27.) The Government asked that she continue to be a project manager in the new contract with MPF. (*Id.* at 20–21.) It also instructed, however, that Wills needed to become a CMAR to stay within the role. (*Id.* at 21.) MPF reiterated that expectation. (*Id.* at 22.) Both the Government and MPF recognized that Wills would not have sufficient laboratory or supervisory experience to be eligible to sit for the CMAR examinations until January 17, 2022. (*Id.* at 27, 58; ECF No. 37-5 at 2.) Under the terms of the contract, MPF would have been contractually obliged to provide a project

4

manager with that certification by June 2021, six months after the award of the contract. (ECF No. 37-3 at 17.) In Wills's case, however, entities agreed that she could have until June 2022 to become a CMAR. (ECF No. 37-5 at 2.) Wills agreed to pursue the certification when MPF took over the work that Venesco had been performing. (ECF No. 37-4 at 23.)

Wills worked as the project manager throughout 2021. In that role, she supervised a team of five subordinate employees. As noted above, she would become eligible to sit for the CMAR examinations—that is, she would have accrued five years of laboratory research and three years of supervisory experience—on January 17, 2022. To that end, as early as October 6, 2021, MPF began sending Wills study materials for the tests. *See generally* (ECF No. 37-6). Wills acknowledged receipt of the materials the same day. (*Id.* at 3.)

On January 5, 2022, twelve days before Wills would become eligible to sit for the examinations, Bradley Fisher, the program manager for MPF's work with the Research Institute, sent an email to Wills reminding her of the need to become certified. (ECF No. 37-8 at 2.) The email stated: "Just a reminder that [the CMAR] certification is a contract requirement. I'm very confident in you . . . achieving the appropriate level that is required. I encourage you . . . to study and sit for the [CMAR] exams in question in the coming months." (*Id.*) On January 31, 2022, Kim Faunce, the MPF employee in charge of certifications, sent Wills another email with study materials in the form of slide decks.  (ECF No. 37-9 at 2.)

On February 1, 2022, MPF's President, Anna Gilmore Hall, spoke with Erin Maddox, the Government's contracting officer for its work with MPF, about employee certifications. *See* (ECF No. 37-3 at 104). Gilmore Hall noted that five MPF employees had become appropriately certified since the company took over the contract. (*Id.*) She also noted that Wills

had recently become eligible to take the CMAR examinations and was preparing to do so. (*Id.* at 104–05.) The next day, February 2, 2022, Kim Faunce emailed Wills additional study materials and stated: "Per our conversation, the plan is for you to take your CM[AR] exam in April." (ECF No. 37-10 at 2.)

In the weeks that followed, Faunce continued to check in with the Plaintiff to see if she had applied to sit for the CMAR tests. *See generally* (ECF No. 37-11). As of February 15, 2022, she had not done so. (*Id.* at 3.) Wills stated, however, that the information appeared straightforward and that sitting for the examinations in April would give her enough time to be prepared. (*Id.*) In response, program manager Bradley Fisher instructed her to take them in "March or as soon as possible, instead of April." (*Id.*) He told her that "these certification requirements have caused . . . a lot of grief" and therefore that taking the tests in March was preferable. (*Id.*) Nevertheless, Wills waited until March 1, 2022, to submit her application to sit for the CMAR tests. (*Id.* at 2.)

In spite of the continued reminders and requests from MPF employees, Wills did not sit for the CMAR examinations in either March or April 2022. (ECF No. 37-4 at 81.) At her deposition, she testified that she was "scared [she] was going to fail." (*Id.* at 82.) She also stated that a scheduling conflict arose that prevented her from taking the tests in April. (*Id.* at 54–55.) She scheduled herself to sit for the examinations on June 27 and 28, 2022. (*Id.* at 86.)

On May 11, 2022, Wills emailed MPF's Human Resources department and gave notice that she was pregnant. (ECF No. 37-13 at 2.) MPF states that it had no knowledge of her pregnancy prior to that date, including during the period in which Bradley Fisher and Kim Faunce repeatedly followed-up with Wills about her CMAR certification. (ECF No. 37-1 at

12.) MPF then congratulated Wills and sent her the short-term disability paperwork she would need to take maternity leave. (ECF No. 37-14 at 2.)

After Wills announced her pregnancy to MPF, the company continued to follow up with her regarding the CMAR certification. Around May 27, 2022, the Government emailed MPF to ask about the certification status of three of MPF's employees, including Wills. On May 27, 2022, Bradley Fisher then contacted Wills, stating: "as you can see the contract officer is very serious about the stipulation of you getting CMAR certified. . . . They have pointed out that we have had the contract for over a year and there has been no certification achieved by you. I'm concerned they will give us a very poor CPAR score on the contract. We can't afford that happening. Can you please schedule one of the two exams now? Please advise."[2] Wills responded that she was still working to schedule her tests. At that point, she had been eligible to sit for the Certified Manager of Animal Resources examinations for more than four months (that is, since January 17, 2022).  She concluded her email by asking Bradley Fisher, "[i]n the event that I fail these exams what will I do?" Fisher responded by saying that MPF would abide by the contract, per the Government's direction.

As the Government continued to press MPF regarding Wills's lack of CMAR certification, her work performance was also worsening. On May 11, 2022, the same day she gave notice of her pregnancy, she stated that she had apparently misread an email concerning how the Government wanted its laboratory animals housed. (ECF No. 37-16 at 2.) Such handling of animals was one of the responsibilities of her and her team. (*Id.*; ECF No. 37-4 at

---

[2] The parties do not explain what a CPAR score is. The Court notes that the term stands for Contractor Performance Assessment Report; it is the federal government's method of grading its contractors. *See* CPARS, https://www.cpars.gov/cparsweb/home (last accessed July 2, 2026).

61.) As a result of that apparent misreading, the animals were improperly housed for an entire week. (ECF No. 37-16 at 2.) As a result, the Government directed Wills to prepare a Memorandum for Record to document her mistake. (*Id.*) That Memorandum would then be sent to the Institutional Animal Care and Use Committee. Wills could not remember whether she actually had a conversation with her subordinates concerning what could have been done differently to avoid improperly housing the animals. (ECF No. 37-4 at 62.)

At other times in 2022, Wills failed to communicate with the Government and her staff. Specifically, the Government maintains a breeding colony for mice, called "pups." (*Id.* at 65.) The breeding mice are housed in bedded cages that are cleaned by a machine known as the "cage wash." (*Id.*) Animals, living or dead, are not supposed to be in their cage when sent for cleaning because being present would expose them to "pathogens" to which the Government does not want the mice exposed. (*Id.* at 66.) On two occasions in 2022, Wills's team had mice show up in a cage wash, causing them to be replaced. (ECF No. 37-17 at 2.) Thereafter, Wills offered that she be "writ[ten] up" in MPF's personnel file. (*Id.*) Additionally, on June 7, 2022, she apologized to Brad Fisher "for all the issues that [she was] causing [MPF's] contract" with the Government and stated that she would "do better." (*Id.*)

MPF made the Government aware of Plaintiff's performance issues. For its own part, the Government made its concerns about Wills apparent to individuals at MPF. On May 27, 2022, program manager Bradley Fisher became aware of the Government's impression that she was not satisfactorily performing the contract work. *See* (ECF No. 37-18 at 3; ECF No. 37-17 at 2). He then asked the Government's contracting officer if that impression was correct and for specific instances of poor work performance. (ECF No. 37-18 at 3.) The

Government responded: "Yes, there have been concerns." (*Id.*) It stated that it would later provide specifics. (*Id.*)

The Government did so on June 9, 2022, in a meeting between Ria Moore, MPF's chief operating officer, program manager Brad Fisher, and multiple representatives of the Research Institute, specifically the contracting officer Erin Maddox and the contracting officer representative Lindsey Devine. (ECF No. 37-19 at 5.) They discussed the Government's concerns with Wills's performance as project manager. (*Id.*) The Government enumerated seven concerns related to Wills's "leadership and judgment": (1) Wills needed to become a CMAR, as not being so "ma[de] it hard for her to make good decisions"; (2) she "switched . . . orders without approval," which resulted in a report to the Institutional Animal Care and Use Committee; (3) she had "internally promoted people who were not qualified by the contract requirements"; (4) she "was sitting in meetings on a situation with an employee and use of controlled substances and had no suggestions for how to prevent it from happening again"; (5) she apparently failed to report an employee's use of expired medication on an animal; (6) she did not, from the Government's perspective, have a clear understanding of the performance work statement's requirements; and (7) she did not properly handle communications related to a tuberculosis exposure within her team.[3] (*Id.* at 5–6.) Beyond these enumerated concerns, the Government noted that it had received complaints about Wills from other MPF employees, and, as a result, had concerns about the employees and morale of her

---

[3] MPF took notes of its meeting with the Government. These concerns were memorialized in those notes. (ECF No. 37-19 at 5–6.)

9

team. (*Id.*) Ultimately, the Government requested that MPF remove Wills from her position on the contract. (*Id.*)

That same day, on June 9, 2022, MPF attempted to persuade the Government to give Wills another opportunity. (*Id.*) The Government's contracting officer stated that her leadership was frustrated and wanted Wills removed for both performance issues and lack of certification. (*Id.*)

MPF terminated Wills's employment the following day, June 10, 2022. (ECF No. 37-20 at 2.) MPF's termination letter, provided in person, stated that she was being fired due to (1) her "lack of leadership in providing the required services" for the contract with the Government, and (2) her failure to become certified as required by the contract between the Government and MPF. (*Id.*)

More than a month later, on July 21, 2022, MPF contacted the Government to inquire whether Wills could return to working on the contract under a different position. (ECF No. 37-21 at 2.) The Government stated that it had suffered harm as a result of her past decisions. (*Id.*) It indicated that it was not open to having Wills return to the contract. (*Id.*)

## II.     Procedural History

On August 9, 2022, Wills filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in its Baltimore office. (ECF No. 5 ¶ 11.) On December 20, 2022, the EEOC declined to proceed with her complaint and issued her a Notice of Right to Sue. (*Id.* ¶ 12.)

On May 1, 2023, Plaintiff initiated this action in this Court by filing a two-count Complaint against Defendant MPF Federal, LLC, and Lloyd J. Austin, III, in his official

capacity as the Secretary of the Department of Defense.[4] (ECF No. 1.) Two days later, on May 3, 2023, she filed the operative two-count Amended Complaint, which again sued MPF but substituted Secretary Austin for Christine Wormuth, in her official capacity as the Secretary of the Army. (ECF No. 5.) The Amended Complaint alleges, in Count One, sex and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and, in Count Two, sex discrimination in violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't §§ 20-606 *et seq.* (*Id.*) MPF filed an Answer to the Amended Complaint. (ECF No. 14.) The Department of the Army, on behalf of Secretary Wormuth, moved to dismiss the claims against her. (ECF No. 20.) This Court granted that Motion by Memorandum Opinion and Order on April 14, 2025. (ECF No. 32.)

This case then proceeded to discovery with respect to the two claims against MPF. On December 12, 2025, MPF filed the pending Motion for Summary Judgment. (ECF No. 37.) Wills has filed a Response (ECF No. 40), and MPF has filed a Reply (ECF No. 41).

## STANDARD OF REVIEW

To win summary judgment under Federal Rule of Civil Procedure 56, MPF must show that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

---

[4] On September 5, 2025, President Donald J. Trump signed an executive order changing the name of the Department of Defense to the Department of War. *See* Exec. Order 14347, 90 Fed. Reg. 43893 (Sep. 5, 2025).

nonmoving party." *Anderson*, 477 U.S. at 248. A party cannot create a genuine dispute of material fact through "mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 141 (4th Cir. 2008). If the moving party has carried its burden of showing that no material fact exists, then the nonmoving party must produce "significantly probative" evidence to avoid summary judgment. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

When considering a motion for summary judgment, a court's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial. *Anderson*, 477 U.S. at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). This Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312. The Court is not permitted to make credibility determinations at the summary-judgment stage, as that is the role of the fact finder, as is the resolution of all factual disputes. *Tolan v. Cotton*, 572 U.S. 650 (2014). As such, "the plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990)).

## ANALYSIS

In Count One, Wills alleges that MPF committed sex and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (ECF No. 5.) In Count Two, she alleges that MPF committed sex discrimination in violation of the Maryland

12

Fair Employment Practices Act, Md. Code Ann., State Gov't §§ 20-606 *et seq.* (*Id.*) As explained

below, MPF is entitled to summary judgment on both claims.

I.    **The Court Considers All Claims Under the Title VII Discrimination Standard**

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discharg[ing] any

individual, or otherwise . . . discriminat[ing] against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a); *see Coleman v. Md. Ct. of

Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (setting out Title VII's discrimination standard).

"Under the Pregnancy Discrimination Act, a pregnancy discrimination claim is 'analyzed in

the same manner as any other sex discrimination claim brought pursuant to Title VII." *Jordan

v. Radiology Imaging Assocs.*, 577 F. Supp. 2d 771, 779 (D. Md. 2008). Additionally, the Maryland

Fair Employment Practices Act "is the state law analogue of Title VII." *Ashram v. Mayor &

City Council of Balt.*, 85 F. Supp. 3d 841, 849 (citing *Finkle v. Howard Cnty.*, 12 F. Supp. 3d 780,

784 (D. Md. 2014)). Courts accordingly evaluate discrimination claims pursuant to the

Maryland Fair Employment Practices Act under the Title VII standard. *See Nganga-Kongo v.

Univ. of Md. Med. Sys. Corp.*, --- F. Supp. 3d ---, RDB-24-3449, 2026 WL 886368, at *8 (D. Md.

Apr. 1, 2026) (citations omitted); *Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196, 211

(D. Md. 2025) (citations omitted). In sum, the Court considers all of Wills's claims together

under the Title VII discrimination standard, including the relevant precedent.

II.    **Legal Standard for Title VII Discrimination Claims**

As noted, Title VII prohibits an employer from discharging or discriminating against

an employee on the basis of sex, among other protected categories. 42 U.S.C. § 2000e–2(a).

"A plaintiff may prove discrimination through either of two methods: (1) direct evidence of discrimination, or (2) through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (citing *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019)). Wills offers no direct evidence of discrimination.[5] (ECF No. 40-1 at 14–15.) Accordingly, only the *McDonell Douglas* framework is relevant here.

The *McDonnell Douglas* framework proceeds in three steps, with the burden of production shifting at each step. *Wannamaker-Amos*, 126 F.4th at 255. Importantly, the burden of persuasion always remains with the plaintiff. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). At step one, a plaintiff must first make out a prima facie case of discrimination. *Wannamaker-Amos*, 126 F.4th at 255 (citing *Haynes*, 922 F.3d at 223). The burden of proof then shifts to the employer at step two to "articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action." *Id.* (citing *Haynes*, 922 F.3d at 223). If the employer carries its burden of production at step two, then, at step three, "the plaintiff must then prove by a preponderance of the evidence that the neutral reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Burdine*, 450 U.S. at 253).

The Supreme Court has long recognized that the *McDonnell Douglas* framework was "never intended to be rigid, mechanized, or ritualistic." *U.S. Postal Serv. Bd. of Govs. v. Aikens*,

---

[5] "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested employment decision." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013). "If believed, direct evidence 'would prove the existence of a fact . . . without any inference or presumptions.'" *Jordan v. Radiology Imaging Assocs.*, 577 F. Supp. 2d 771, 779 (D. Md. 2008) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996)). This is a "demanding standard." *Id.* (citations omitted).

460 U.S. 567, 577 (1978) (citations omitted). "[T]he core of every Title VII case remains the same, necessitating resolution of 'the ultimate question of discrimination.'" *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010) (quoting *Aikens*, 460 U.S. at 714). Courts must accordingly "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination'" of ultimate question of discrimination. *Id.* (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)); *accord Wannamaker-Amos*, 126 F.4th at 255 (citations omitted).

### III. Application of the *McDonnell Douglas* Framework

#### a. Prima Facie Case

Wills has not established a prima facie case of sex discrimination. "To do so, a plaintiff must show (1) that she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021) (citing *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)). In its Response, MPF contests only the third element of the prima facie case.[6] *See* (ECF No. 37-1 at 24). Specifically, Defendant argues that Wills was not "performing her job duties at a level that met her employer's (or its [G]overnment customer's) legitimate expectations." (*Id.*)

With respect to the third element, "the only question at the prima facie stage is whether [the plaintiff] was, in fact, performing her job at a satisfactory level at the time of her

---

[6] MPF asserts, by footnote in its Motion for Summary Judgment, that it "does not concede that [Plaintiff] established all, or some combination of, the other elements." (ECF No. 37-1 at 24 n.6.) Without having briefed an argument as to those elements, the Court assumes without deciding that they are met and considers solely whether Wills has failed to demonstrate the third element regarding an employer's legitimate expectations.

termination." *Wannamaker-Amos*, 126 F.4th at 255, 256. A plaintiff "need not 'show that [s]he was a perfect or model employee,' only 'that [s]he was qualified for the job and that [s]he was meeting [her] employer's legitimate expectations.'" *Id.* at 256 (alterations in original) (quoting *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 380 (4th Cir. 2022)).

The record in this case is clear that Wills was not satisfactorily performing her job at the time of her termination for two independently sufficient reasons. First, at the time of her termination, Wills had not become a Certified Manager of Animal Resources. MPF's contract with the Government stated that the project manager would be a CMAR within six months of the contract having been awarded. Wills was MPF's project manager. The Government awarded MPF the contract in this case in December 2020. Under the terms of the contract, the project manager would have needed to be qualified as a CMAR by June 2021. The Government was aware that Wills would not be qualified to sit for the CMAR exams until January 17, 2022. By agreement with MPF, the Government consented to permit Wills until June 2022 to become a CMAR. That agreement, however, was between MPF and the Government, not Wills. Additionally, the record is clear that the Government consented to giving Wills an extra year to become certified of its own accord, and without amending the contract between MPF and itself in any way. As such, the Government had no obligation to honor that arrangement. Likewise, MPF had no obligation to permit Wills to continue working without the proper certification up until the final day of June 2022. The simple fact is that the project manager on MPF's contract with the Government was required by that contract to be a Certified Manager of Animal Resources. At the time of her termination, Wills was not so certified. She was, by the terms of the contract, not qualified for the position she held.

Second, at the time of her termination, Wills was not meeting MPF or the Government's legitimate expectations for a project manager. Specifically, she housed mice within her care incorrectly for a week. This caused the Government to instruct Wills to prepare and submit a Memorandum for Record to the Institutional Animal Care and Use Committee, which the parties agree is an agency that oversees animal welfare. Additionally, Wills admitted that she failed to communicate with her team when mice within her responsibilities appeared in a cage wash machine. As noted above, mice are not to be in cages when the cages are washed, as their presence exposes them to pathogens. Additionally, the Government informed MPF that it had no fewer than seven concerns with Wills' performance, including, for example, (1) that she did not alert MPF that one of her team members had been using controlled substances; (2) that she failed to report a team member's use of expired medication on an animal within her control; and (3) that she failed to report a tuberculosis exposure.

As MPF notes, the Government—MPF's client and the entity for whom the contract work was ultimately to be performed—scheduled a meeting with MPF to discuss its concerns with Wills' performance. Ultimately, the Government asked that MPF remove Wills from her position as project manager. This record evidence makes clear that Wills was not meeting her employer's legitimate expectations for her position. Thus, she fails to show the third element of the prima facie case of sex discrimination under Title VII. MPF is therefore entitled to summary judgment on all claims.

> b.  Legitimate, Non-Discriminatory Reason

Even if Wills could demonstrate a prima facie case, which she cannot, MPF has met its burden at step two of *McDonell Douglas* by "articulat[ing] a legitimate, non-discriminatory

17

justification for its allegedly discriminatory action." *Wannamaker-Amos*, 126 F.4th at 255 (citing *Haynes*, 922 F.3d at 223). This is a burden "'of production, not persuasion; and it can involve no credibility assessment.'" *Id.* at 257 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). So long as "an employer articulates a reason for discharging the plaintiff not forbidden by law," a district court does not consider "whether the reason was wise, fair, or even correct." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (quotations omitted). "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 258–59, and *Young v. Lehman*, 748 F.2d 194, 198 (4th Cir. 1985)).

MPF claims that it terminated Wills's employment because she was not a Certified Manager of Animal Resources, despite having been eligible to become so certified on January 17, 2022. As noted above, Wills having proper certification was a condition of MPF's contract with its client, the Government. MPF's termination of Plaintiff for failure to attain the certification required by the contract is a legitimate, non-discriminatory reason for an adverse employment action. MPF has met its burden of production at the second step of *McDonell Douglas*.

### c. Pretext

At the third step of *McDonnell Douglas*, the burden of production shifts back to Wills and merges with the ultimate burden of persuasion. *See Burdine*, 450 U.S. at 256. At this final step, she must "produce evidence sufficient to create a material issue of fact as to whether [MPF]'s alleged reason for firing her was not its true reason, but rather a pretext for

discrimination." *Wannamaker-Amos*, 126 F.4th at 257 (citing *Haynes*, 922 F.3d at 223). A plaintiff can show pretext one of two ways. *Id.* The first is by offering evidence that the employer's neutral justification at step two is "unworthy of credence." *Id.* (quoting *Reeves*, 530 U.S. at 143). The second is "adducing other forms of circumstantial evidence sufficiently probative of discrimination." *Id.* (citing *Reeves*, 530 U.S. at 147). If the plaintiff makes either showing of pretext, summary judgment must not be entered. *Id.* (citing *Sempowich*, 19 F.4th at 652). Wills does not clearly organize her argument into one of the two methods of proving pretext. *See* (ECF No. 40-1 at 18). Nevertheless, as explained below, her argument is essentially that MPF's stated reasons for terminating her employment are unworthy of credence. Specifically, Wills contests that MPF's asserted reasons are "disputed, selectively enforced, and [were] advanced only after Plaintiff disclosed her pregnancy." (*Id.*)

Wills argues that her "certification timeline [was] disputed, and was selectively enforced."[7] (*Id.* at 19.) This argument rests on a faulty premise and is therefore entitled to no weight. The record is quite clear that the Government's contract with MPF required that the person in the project manager position be a Certified Manager of Animal Resources within six months of the contract having been awarded. Wills was the project manager, and was undoubtedly required to become a Certified Manager of Animal Resources. The record is also

---

[7] Wills cites two Fourth Circuit cases from 1979 to support this argument. (ECF No. 40-1 at 19.) One, *Charbonnages de France v. Smith*, 597 F.2d 406, 409 (4th Cir. 1979), is wholly inapposite as it is a contract dispute involving coal mining which states nothing relevant to this employment law dispute. Moreover, to the extent that it stands for Wills' proffered proposition—that summary judgment should not be entered where the existence or enforcement of a rule is disputed—that proposition bears no meaning in this case as there is no rule about which Wills can claim a legitimate dispute, as explained below. The second case she cites, *Morrison v. Nissan Co.*, 601 F.2d 139, 140 (4th Cir. 1979), is an antitrust case and is therefore inapposite. To the extent that those cases say something about the general summary judgment standard, they are consistent with the standard that this Court always follows when evaluating motions pursuant to Rule 56. Furthermore, neither case aids in any way to Wills's argument that the six-month time limit in the contract between MPF and the Government was "selectively enforced."

clear that the Government agreed *with MPF* that Wills could have until June 2022 to become certified, as opposed to June 2021 (six months from the contract having been awarded to MPF). Wills argues that this so-called "certification deadline" was "selectively enforced" because, in her telling, MPF only began to care about the "deadline" after she announced her pregnancy on May 11, 2022. (*Id.* at 20.) She repeatedly notes in her Response that she was scheduled to sit for the CMAR examination on June 27 and 28, 2022. *See* (*id.*). She also claims that MPF "permitted her to serve as Project Manager without issue for more than a year." (*Id.*)

This argument is logically unsound, as it confuses multiple aspects of the contract's requirement that the project manager be certified. First, and foremost, the contractual right to have a Certified Manager of Animal Resources as a project manager belonged to the Government, not MPF or Wills. To the extent that MPF had not provided a certified project manager within six months, the Government could seek redress against MPF on the basis of that term. Second, just because the contract guaranteed that MPF have a certified project manager within six months does not mean that the person in that role is entitled to that amount of time to become so certified. Put differently, the contract's six-month timeline created an obligation between MPF and the Government, and provided no rights or entitlements of any kind to Wills. She cannot therefore argue that MPF "selectively enforced" a deadline in a contract to which she was not a party. That argument, then, does nothing to create a triable issue of fact on pretext.

Wills also argues that MPF's performance-based explanations "are factually contested and post hoc." (ECF No. 40-1 at 20.) She states that MPF's "prolonged acceptance of [her] work without certification followed by sudden urgency immediately after her pregnancy

contradicts its claim that certification noncompliance suddenly compelled termination." (*Id.* at 21.) This argument must fail because it is unsupported by the facts in the record prior to her pregnancy announcement of May 11, 2022. The argument must also fail because it ignores events that occurred between her pregnancy announcement and her termination on June 10, 2022.

First, while MPF may have continuously permitted Wills's work even without certification until her termination on June 10, 2022, the record reflects that it did not do so without some difficulty. In particular, Bradley Fisher and Kim Faunce, the MPF employees most involved in trying to get Wills to become certified as a CMAR, repeatedly asked her to register for the exam. Separately, Wills's argument, that Defendant only paid attention to the "deadline" after she announced her pregnancy on May 11, 2022, is contradicted by the facts in the record. As early as October 2021, Faunce had been sending study materials to Wills and reminding her that she could sit for the exam as early as January 17, 2022. As early as February 2022, Bradley Fisher instructed Wills to "count on taking the first exam in March [of 2022] or as soon as possible, instead of April," or later. (ECF No. 37-1 at 11.) In February of that year, Fisher told Wills that "these certification[] requirements have caused . . . a lot of grief." (*Id.*)

Second, Wills's argument, that MPF merely created a post hoc rationalization by which to terminate her employment after she announced her pregnancy, ignores the critical meeting between the Government and MPF on June 9, 2022. During that meeting, the Government—MPF's client—met with MPF to discuss Wills's performance. The Government listed no fewer than seven concerns it had with her performance, and specifically asked for Wills to be removed from the project. (ECF No. 37-1 at 16.) The Government noted that it had received

complaints about working with Wills and that her actions had been detrimental to its "mission." (*Id.*)

At step three of the *McDonnell Douglas*, the plaintiff must produce record evidence that sufficiently demonstrates that an employer's reason is pretextual. *Wannamaker-Amos*, 126 F.4th at 257 (citing *Haynes*, 922 F.3d at 233). Wills has not done so. Instead, she attempts to reframe the same evidence as bolstering her claim of discrimination. She produces no new evidence, however, which would create a triable issue of fact on pretext. A such, she has failed to meet the ultimate burden of persuasion in the *McDonnell Douglas* scheme. The Court GRANTS summary judgment to MPF on all claims.

## CONCLUSION

For the reasons stated above, Defendant MPF Federal's Motion for Summary Judgment (ECF No. 37) is GRANTED. Judgment shall be entered for the Defendant.

A separate Order follows.

Date: August 3, 2026

     /s/
Richard D. Bennett
United States Senior District Judge